IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 20, 2017 Session

## STATE OF TENNESSEE v. MOSES A. BALLARD, JR.

**Appeal from the Criminal Court for Washington County**
**No. 39880A     Stacy L. Street, Judge**

_____

### No. E2017-00587-CCA-R3-CD
_____

The Defendant, Moses A. Ballard, Jr., was indicted for unlawful possession of a firearm and first degree premeditated murder. See Tenn. Code Ann. §§ 39-13-202, -17-1307. The unlawful possession of a firearm charge was ultimately dismissed upon the State's request. Following a jury trial, the Defendant was convicted of the lesser-included offense of second degree murder, a Class A felony. See Tenn. Code Ann. § 39-13-210. The trial court subsequently imposed a sentence of thirty-eight years. In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his conviction; (2) that the trial court erred in allowing an expert witness to testify beyond the scope of her expertise; (3) that the trial court erred by not allowing recorded jail phone calls between the Defendant and two of the State's witnesses to be introduced at trial; (4) that the trial court erred by not allowing "evidence regarding the gang affiliation of various involved parties" to be introduced at trial; (5) that the State committed a discovery violation by withholding evidence; (6) that the withheld evidence "amount[ed] to newly discovered evidence" requiring a new trial; and (7) that the trial court was unable to perform its duty as the thirteenth juror "due to the withheld evidence."[1] Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Christopher G. Byrd, Johnson City, Tennessee, for the appellant, Moses A. Ballard, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Kenneth Carson

_____
[1] For the sake of clarity, we have reordered and renumbered the issues from how they appear in the Defendant's brief.

Baldwin and Frederick Michael Lance, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

Salina Allen testified that in the early morning hours of July 4, 2014, she and several other people were at the home of Wesley Blair "[g]etting ready to go out to the club." Ms. Allen recalled that the Defendant and the victim, Michael Rowe, were at Mr. Blair's house. Mr. Blair, Tonya Hartley, and Brittany Maples were also present that night, according to Ms. Allen, along with "a couple other people" who were "in and out." Ms. Allen testified that everyone in the house except for herself had been drinking alcohol. Ms. Allen also testified that she saw a gun in the house that night, but she did not know to whom it belonged and could not identify the type of gun.

Ms. Allen testified that she had a sibling-like relationship with the Defendant but that the Defendant was "angry" and "yelling" that night. According to Ms. Allen, the Defendant's "[a]gitated" demeanor that night was out of character for him. At one point, Ms. Allen "put [her] foot up" and "raised [her] leg up just a little bit" so the Defendant could look at her shoe. The Defendant "pulled [her] leg up further" and she told him to stop. Ms. Allen testified that she "pushed [the Defendant] back with [her] toes." The Defendant then said, "[D]on't put your feet on me, you f--king [b---h]," and "smacked" Ms. Allen. According to Ms. Allen, the Defendant pulled her off the couch by her foot, "smacked [her] again [once she was] on the floor," and threw her shoe at Ms. Hartley. Ms. Allen testified that the Defendant had never treated her like this.

According to Ms. Allen, the victim "got upset" and "exchanged" words with the Defendant. Ms. Allen recalled that "there was a lot of yelling involved" and then "[t]here was a little bit of a tussle in the house" with the victim and the Defendant "[b]umping" chests "like . . . [they] want[ed] to fight each other." Ms. Allen and Ms. Hartley got between the men and "tried to keep them apart." The Defendant was told by the others to "get the [f--k] out" of the house. Ms. Allen testified that the Defendant "got upset and left." Ms. Allen recalled that the Defendant "had kind of like tears in his eyes" and was "very mad."

Ms. Allen recalled that about fifteen to thirty minutes later, around 1:00 a.m., the victim and Ms. Hartley left the house. Ms. Allen testified that she then heard "some speaking" outside followed by five or six gunshots. Ms. Allen "opened the door" and saw the Defendant running down the street "pretty fast." Ms. Allen testified that she saw the victim get out of his car and shoot at the Defendant as he ran away. Ms. Allen further testified that she knew the victim had been shot because he was "holding his [left] side."

According to Ms. Allen, the victim "didn't make it that far" from his car before he collapsed. Ms. Allen testified that she ran to the victim and "caught [him] before he hit the ground," but that he "was pretty much gone." Ms. Allen saw that the victim had been shot in the "upper torso" and was bleeding "out of the wounds."

Ms. Allen admitted that she did not see a gun in the Defendant's hand as he ran away from the victim. Ms. Allen also admitted that, earlier that night, the victim had said he needed to get out of town because "somebody [was] going to get [him] or [he was] going to get somebody." Ms. Allen further admitted that she told the police investigator that the victim "was ready to choke out" the Defendant during their "tussle."

Ms. Maples testified that she was the Defendant's ex-girlfriend and that she was present at Mr. Blair's house on the night of the shooting. Ms. Maples recalled that the Defendant arrived at Mr. Blair's house "[l]ate that night." Ms. Maples and the Defendant "had been separated for about a month at the time." Ms. Maples testified that she left the house and walked to a nearby gas station after the Defendant "said something" to her. When Ms. Maples returned to the house she "heard an altercation inside the house." However, the door was locked, and Ms. Maples could not get back inside. Ms. Maples sat down on the sidewalk and "a moment" later saw the Defendant in a car going away from the house "pretty fast."

Ms. Maples was eventually able to get back in the house. Ms. Maples recalled that "everybody . . . was very upset" because the Defendant had "smacked" Ms. Allen. Ms. Maples testified that the victim and Ms. Hartley, as they were leaving, told her not to let the Defendant back inside the house. According to Ms. Maples, Ms. Hartley returned "right after she had left" to get her backpack. As Ms. Maples opened the door to let Ms. Hartley back in, the Defendant "came to the door" and said "he wanted to apologize for the incident." According to Ms. Maples, Ms. Hartley told the Defendant that "he needed to apologize" to the victim.

Ms. Maples testified that she "went to stand at the [screen] door to see what would happen." Ms. Maples testified that she watched the Defendant walk around the front of the victim's car to the driver's side "right there by [the] mirror." Ms. Maples recalled that she saw the Defendant's "mouth moving" and then saw "fire come from a gun and heard the gunshots go off." Ms. Maples estimated that there were "between four and six" gunshots. Ms. Maples testified that the Defendant was the one shooting and that she did not see any gunfire come from inside the victim's car. Ms. Maples further testified that the Defendant "was right there by the window" pointing the gun at the victim and "shooting inside the car" when the gunfire first began. According to Ms. Maples, the Defendant then "started to walk backwards as he was shooting" before turning around and running away.

Ms. Maples testified that she saw the victim get out of the car "holding his stomach." The victim "was firing back at" the Defendant while Ms. Hartley "was on the ground screaming for everybody to get back in the house and not to say [any]thing." Ms. Maples testified that she saw the Defendant running "pretty fast" eventually going "between two houses." Ms. Maples thought she saw the Defendant fall to the ground, so she left the house to check on him. Ms. Maples testified that she did not see the Defendant, but she did see the victim "on the ground" approximately "ten to fifteen steps" away from his car.

Ms. Maples admitted that she had testified at the preliminary hearing that she was in the bedroom and did not see what happened when the shooting started. According to Ms. Maples, she testified that way at the preliminary hearing because she "feared" the Defendant and "knew what he was capable of." Ms. Maples claimed that she had been threatened "[o]n both sides" to testify either for or against the Defendant. Ms. Maples also admitted that she had testified at the preliminary hearing that there had already been "arguments" and "everyone . . . [was] upset" at Mr. Blair's house before the Defendant arrived. Ms. Maples recalled that she had seen Ms. Hartley with a gun that night, but not the victim. Additionally, Ms. Maples admitted that she had a prior theft conviction.

Koron Fairley testified that he knew the Defendant from "the street." According to Mr. Fairley, the Defendant asked Mr. Fairley "to hold a pistol for him" because "he didn't have [any]where else to put it." Mr. Fairley testified that he agreed and put the gun "in a shoe at [his] house." Mr. Fairley recalled that the gun was a black and silver 9-millimeter. According to Mr. Fairley, the Defendant called him on the night of the shooting and told him that he was coming to get the gun. Mr. Fairley estimated that the Defendant arrived fifteen minutes later. Mr. Fairley testified that the Defendant "seemed agitated" and intoxicated.

Mr. Fairley admitted that he had prior "[d]ope charges." Mr. Fairley further admitted that he had recently pled guilty in federal court to conspiracy to distribute crack cocaine. Mr. Fairley testified that he told the police about the Defendant's gun before he was indicted in federal court but admitted that he was aware that a federal indictment was likely to occur. Mr. Fairley also admitted that he agreed to testify in hopes of having his federal sentence reduced. In fact, Mr. Fairley told the investigator in this case that he would not cooperate with him unless the investigator in his federal case "came through" for him. Additionally, Mr. Fairley admitted that he had initially told the investigator that he was not sure of the date or the year when this happened and that the Defendant had picked up the gun before dark.

Following the shooting, the Defendant was apprehended and taken to the Johnson City Medical Center (JCMC). The Defendant had a gunshot wound just below his left buttock and one of his calves had been grazed by a bullet. The Defendant told the

-4-

admitting nurse that he had used marijuana, cocaine, and ecstasy in the past and that he drank five glasses of alcohol a day. Testing of the Defendant's blood revealed that he had recently used marijuana, cocaine, and alcohol prior to his admission to the hospital. The hospital's blood screen did not test for ecstasy.

When investigators for the Johnson City Police Department (JCPD) arrived, the crime scene stretched out for approximately one block and numerous cartridge casings along with broken glass were found in the street. A total of nineteen cartridge casings were recovered from the street. The investigators also found an unfired round in the street. There was only "a little bit of blood" on the street from where the victim had collapsed. Two handguns were eventually recovered from a house "the next block down" from Mr. Blair's house. One was a 9-millimeter Ruger P95 with its serial number removed. The second was a 9-millimetter Ruger P89. No fingerprints were recovered from either of the guns or any of the cartridge casings.

The investigators impounded and inventoried the victim's car. There were five bullet holes present on the driver's side of the car: one going through the windshield and into the dash near the car's VIN number; one just above the front driver's side tire; one at the hinge area where the driver's side door connected to the body of the car; one in the driver's side door a few inches away from the driver's side mirror; and one several inches underneath the door handle on the driver's side door. There was also a "dimple" at the top of the driver's side door that suggested a shot was fired into the door from inside the car. However, the investigators believed that this was "older damage" because there was "some rust" on the edges of where the paint had "flaked off" the "dimple."

JCPD Investigator Johnnie Willis, the lead investigator in this case, testified that he and another investigator took pictures of the car with rods they had "bought from Home Depot" inserted into the holes in an attempt "to show a trajectory . . . of the projectiles." These pictures were shown to the jury. The jury was also allowed to view the car in a parking lot behind the courthouse with the rods "inserted . . . into the car . . . as they appeared in [the] photograph[s]."

Inside the car, the investigators found broken glass from the driver's side window in the driver's seat, the console, the floorboard, and the panel underneath the driver's side door. A cartridge casing was found on the floorboard underneath the driver's seat. Two bullet fragments were found on the driver's side floorboard. An unfired round was found on the passenger's seat. Investigator Willis testified that it was possible that this unfired round and the unfired round found in the street were from "a gun that . . . jammed." There was no blood or tissue found inside the car. A third bullet fragment was found in the victim's clothing along with broken glass in the victim's left front pocket.

Pictures of the interior portion of the driver's side door were also introduced at trial. There was a hole at the bottom of the door that Investigator Willis testified was consistent with the bullet hole underneath the door handle on the exterior of the door. Investigator Willis believed that the bullet that made these holes struck the bottom of the driver's seat. There was also a hole above the interior door handle. Investigator Willis believed that this hole aligned with the "dimple" at the top of the door. Just underneath the interior door handle there was a tear in the upholstery.

Investigator Willis testified that he could not remember if the bullet hole near the driver's side mirror on the exterior of the door "was possibly a pass through or not." Investigator Willis continued, stating that it was "[n]ot as clear as the one at the bottom of the door handle." Investigator Willis conceded that it was possible that not all of the bullets penetrated into the interior of the car. Investigator Willis testified that he partially removed the door panel but was unable to find anymore bullet fragments. Investigator Willis did not remember if he and the other investigators attempted to run a rod "from the inside" of the car, but if they did he "didn't take a picture of it."

Subsequent forensic testing revealed that the two bullet fragments recovered from inside the victim's car, the bullet fragment recovered from the victim's clothing, the cartridge casing recovered from the victim's car, and six of the cartridge casings recovered from the street had all been fired from the Ruger P95. The other thirteen cartridge casings recovered from the street had all been fired from the Ruger P89. Based upon his examination of the victim's car and the crime scene, Investigator Willis believed that the gunfire started at the victim's car.

Doctor Nicole Masian, an expert in forensic psychology, testified that she performed an autopsy on the victim's body. Dr. Masian opined that the manner of the victim's death was homicide caused by gunshot wounds to his abdomen and arm. Dr. Masian testified that the victim was struck by three bullets. A bullet struck the victim's left arm traveling "front to back, downward and left to right," exiting the back of the victim's arm and "caus[ing] a graze wound" on the victim's back. Another bullet struck the victim's left arm and "blew off" a chunk of the victim's flesh. Dr. Masian also found a small bullet fragment embedded in the victim's left shoulder just above the gunshot wounds to his arm.

A third bullet struck the victim in the left abdomen. Dr. Masian opined that the bullet traveled "left to right, . . . probably slightly downward and front to back" until the bullet struck the victim's fourth lumbar vertebra. The bullet was then "deflected downward" and exited "beneath the [victim's left] buttock." After exiting the victim's body, the bullet grazed the victim's right thigh.

-6-

Dr. Masian testified that "there was about four liters of blood" in the victim's abdominal cavity when doctors at the JCMC performed surgery in attempt to save the victim's life. Dr. Masian opined that, depending on "how big the hole [was] and the direction of pressure," it would not be unusual for someone shot in the abdomen to have most of his bleeding be internal rather than outward. However, Dr. Masian admitted that she would expect there to be a "limited amount of bleeding" from the victim's wounds to his arm and abdomen.

Dr. Masian testified that she was unable to determine the range at which the victim was shot because there was no soot or stippling on the victim's body. Dr. Masian also testified that the angle of the wound to the victim's abdomen was "not exactly straight on." Dr. Masian was asked if the victim could "have been seated" when he was shot. Dr. Masian responded that the victim "could have been in various different positions," including a seated position. Dr. Masian also testified that the victim had a blood alcohol level of .137 percent at the time of his death.

Based upon the foregoing, the jury convicted the Defendant of the lesser-included offense of second degree murder. Following a sentencing hearing, the trial court imposed a sentence of thirty-eight years. The Defendant filed a timely motion for new trial and an amended motion for new trial, which the trial court ultimately denied. This appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for second degree murder. The Defendant argues that the eyewitnesses to the shooting were "not reliable" and that the physical evidence suggested that the victim was shot "in the street during [a] gunfight" rather than while he was seated in his car. The State responds that the evidence was sufficient to sustain the Defendant's conviction.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As pertinent to our review, second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Second degree murder is a result of conduct offense. State v. Brown, 311 S.W.3d 422, 431 (Tenn. 2010). Therefore, also as pertinent to our review, a person acts knowingly "with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

Here, Ms. Maples testified that she witnessed the Defendant fire "between four and six" shots at the victim while the victim was seated in his car. She then saw the victim exit his car "holding his stomach." Ms. Allen testified that she heard five or six gunshots and that when she opened the door, she saw the Defendant running away while the victim got out of his car "holding his side." Ms. Allen also testified that the Defendant had left Mr. Blair's house after "a tussle" with the victim. Mr. Fairley testified that the Defendant came to his house on the night of the shooting to get a 9-millimeter handgun Mr. Fairley had been keeping for the Defendant.

The victim was struck by three bullets. There were five bullet holes in the exterior of the victim's car, and the driver's side window had been shattered. Two bullet fragments were found in the driver's side floorboard of the victim's car along with a cartridge casing. A third bullet fragment was found in the victim's clothing along with broken glass in the victim's front left pocket. The six cartridge casings found in the street

-8-

were fired from the same gun as the bullet fragments and the cartridge casing found inside the victim's car.

The Defendant's arguments regarding the forensic evidence and the credibility of the eyewitnesses attack the weight of the evidence against him. This court will not reweigh the evidence on direct appeal. See Sheffield, 676 S.W.2d at 547; Cabbage, 571 S.W.2d at 835. The jury heard the Defendant's theory that the victim was not seated in the car when he was shot and the Defendant's attacks on the credibility of the eyewitnesses. The jury was also instructed on self-defense. It was the province of the jury to address these questions of witness credibility, conflicts in testimony, and the weight and value to be given to evidence. See Bland, 958 S.W.2d at 659. Therefore, we conclude that the evidence was sufficient to sustain the Defendant's conviction.

## II. Scope of Forensic Pathologist's Expertise

The Defendant contends that the trial court erred in allowing Dr. Masian to testify beyond the scope of her expertise as a forensic pathologist. The Defendant argues that Dr. Masian was not qualified to answer a hypothetical question about "the trajectory of shots into the [victim's] vehicle." The State responds that Dr. Masian did not testify beyond the scope of her expertise.

During her testimony, Dr. Masian was asked by the prosecutor if she had examined the victim's car before trial. Dr. Masian responded that she had, and the prosecutor asked if she saw "any of those shots that [she] thought . . . could have caused that wound to the abdomen?" Defense counsel objected because he had "never seen anything" in Dr. Masian's autopsy report "about various trajectory rods and which one" could have cause "which wound." The trial court ruled that Dr. Masian could not "testify about trajectory in the vehicle unless she [could] qualify as an expert."

The prosecutor then asked if they could pose a hypothetical question to Dr. Masian. Defense counsel stated that he "would guess [that] she[ was] not qualified to" answer "anything with looking at the car, or the trajectory of those rods." The trial court ruled that the prosecutor could ask Dr. Masian a hypothetical question but cautioned that it would give the prosecutor "very little room . . . on this." The prosecutor then asked if, "[a]ssuming hypothetically[,] that those rods fairly depict[ed] the trajectory of the bullets having gone through the car . . . and [that] . . . the victim . . . was seated in the car" would "any of [the] shots . . . have been compatible with the abdomen wound?" Dr. Masian responded that "[h]ypothetically, at least, one of the rods through the door could have been compatible with that wound."

Defense counsel began his cross-examination of Dr. Masian by showing her a photograph of the victim's car with the "trajectory" rods inserted into the bullet holes.

Defense counsel asked Dr. Masian to identify "which one of [the] rods" that she felt was compatible with the wound to the victim's abdomen. Dr. Masian identified the bullet hole near the driver's side mirror. Defense counsel then asked Dr. Masian if her answer was "based on the trajectory alone, not any observation of the vehicle or anything" and Dr. Masian responded, "Yes."[2]

"Trial courts act as gatekeepers when it comes to the admissibility of expert testimony." State v. Scott, 275 S.W.3d 395, 401 (Tenn. 2009). This court "will not reverse a decision regarding the admission or exclusion of expert testimony unless the trial court has abused its discretion." Id. at 404. An abuse of discretion occurs when the trial court "applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." Id.

Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tennessee Rule of Evidence 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." However, "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703.

Experts may answer a hypothetical question so long as the question does not "assume facts that are not supported by the evidence," is not "based on untrustworthy or incomplete data," or is otherwise "misleading." State v. Prentice, 113 S.W.3d 326, 335 (Tenn. Crim. App. 2001). None of those situations are present here. Instead, the Defendant argues that Dr. Masian was not qualified to answer the hypothetical question because it involved "the trajectory of shots into the [victim's] vehicle." Dr. Masian was not asked to determine the trajectory of a bullet based on the holes in the car. Instead, she was asked, assuming the "trajectory" rods were correctly placed, if any of them could have been consistent with the wound to the victim's abdomen. Defense counsel then asked Dr. Masian on cross-examination to specify which bullet hole was consistent with the victim's wound.

---

[2] In his brief, the Defendant contends that the State committed a violation of Tennessee Rule of Criminal Procedure 16(a)(1)(G), which provides for the discovery of expert reports, because there was nothing in the autopsy report "relating to [Dr.] Masian's examination of various bullet trajectories and their connection to the fatal wound." It appears from the transcript that Dr. Masian was asked to examine the car by the prosecutor sometime after the autopsy was performed and that there was no report by Dr. Masian on this examination to disclose. Furthermore, Dr. Masian testified that her response to the State's hypothetical was not based on "any observation of the vehicle or anything."

In the past, this court has held that qualified medical experts could testify as to the effect and path of a bullet through the human body. See Bryant v. State, 539 S.W.2d 816, 819 (Tenn. Crim. App. 1976) (citing Moon v. State, 242 S.W. 39 (Tenn. 1922)); Taylor v. State, 551 S.W.2d 331, 332-33 (Tenn. Crim. App. 1976). This court has also previously held that an expert forensic pathologist may testify as to whether a gunshot wound was self-inflicted. See State v. Atkins, 681 S.W.2d 571, 576-77 (Tenn. Crim. App. 1984).

Additionally, forensic pathologists have testified about the location of the shooter or the victim based upon a bullet's path through the victim's body. See State v. Brian Milam, No. M2008-00695-CCA-R3-CD, 2010 WL 744398, at *6 (Tenn. Crim. App. Mar. 3, 2010) (determining the position of the victim's body based upon the path of the bullet through the victim's body and "through the couch" the victim was lying on); State v. Cyrus Randy Whitson, No. M2007-02197-CCA-R3-CD, 2009 WL 3787457, at *2 (Tenn. Crim. App. Nov. 12, 2009) (determining the location of the shooter based upon the path of the bullet through the victim's head). Accordingly, we conclude that the trial court did not err in allowing Dr. Masian to answer the State's hypothetical question regarding the "trajectory" rods placed in the victim's car.

### III. Recorded Jail Phone Calls

The Defendant contends that the trial court erred by not allowing recorded jail phone calls between the Defendant and Ms. Maples and Ms. Allen to be introduced at trial. The Defendant argues that the phone calls could have been used to attack the credibility of these witnesses. Regarding Ms. Maples specifically, the Defendant argues that the phone calls would have demonstrated that she had been threatened for "support[ing]" the Defendant and that what she told the Defendant she saw the night of the shooting differed from her trial testimony. The State responds that the Defendant has waived this issue and has failed to establish plain error.

The trial transcript begins with the trial court's stating that it had held a hearing the previous day on this issue and that it had ruled that the recordings would not be admissible. Defense counsel raised the issue again at trial during his cross-examination of Ms. Maples. The trial court again denied the Defendant's request to introduce the recordings. A transcript of the trial court's hearing on this issue, a copy of the recordings at issue, and a transcript of the recordings were not included in the appellate record.

The Defendant has waived full appellate review of this issue by failing to cite to any legal authorities to support his argument. See Tenn. Ct. Crim. App. R. 10(b) (providing that "[i]ssues which are not supported by . . . citation to authorities . . . will be treated as waived in this court"). As such, we review this issue solely for plain error. The doctrine of plain error applies when all five of the following factors have been established:

-11-

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused must not have waived the issue for tactical reasons; and

(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Here, the record does not clearly establish what occurred in the trial court. Page, 184 S.W.3d at 230. The Defendant failed to include in the appellate record a transcript of the trial court's hearing on this issue. Likewise, the Defendant failed to include a copy or transcript of the recordings. Accordingly, we conclude that the Defendant has failed to demonstrate plain error.

## IV. Gang Affiliation

The Defendant contends that the trial court erred by not allowing "evidence regarding the gang affiliation of various involved parties" to be introduced at trial. The Defendant argues that "this evidence was going to demonstrate [that] the individuals that had threatened [Ms.] Maples were in the same street gang" as the victim. The State responds that the Defendant has waived this issue and failed to demonstrate plain error.

Like the previous issue, the trial court stated at the beginning of the trial transcript that it had held a hearing on this issue the previous day and had ruled to exclude evidence regarding gang affiliations. Again, a transcript of that hearing was not included in the appellate record. Also like the previous issue, the Defendant has waived full appellate review of this issue by failing to cite to any legal authorities to support his argument. See Tenn. Ct. Crim. App. R. 10(b). Because the record does not clearly establish what occurred in the trial court, the Defendant has likewise failed to demonstrate plain error. See Page, 184 S.W.3d at 230.

## V. "Withheld" Evidence

The Defendant's remaining issues all involve the presentation of the victim's car to the jury during trial. The Defendant contends that the State failed to disclose that the tear in the upholstery just underneath the interior door handle was a bullet hole. The Defendant argues that neither defense counsel's "[v]isual inspection" of the car before trial nor the photographs of the car provided by the State during discovery revealed that the tear in the upholstery was a bullet hole. The Defendant further argues that this was

only discovered when a "trajectory" rod was placed in the bullet hole near the driver's side mirror on the exterior of the door and through the tear in the upholstery into the interior of the car just before the jury viewed the car at trial. The Defendant also contends that the fact that the tear in the upholstery was a bullet hole was newly discovered evidence because defense counsel was unaware that the jury saw the "trajectory" rod penetrating into the interior of the car until the day after trial when he saw a picture of the car in the local newspaper. Finally, the Defendant contends that the trial court was unable to perform its duty as the thirteenth juror because the trial court did not see the "trajectory" rod penetrating into the interior of the car.

The State responds that there was no discovery violation because access to the car was provided to defense counsel prior to trial and defense counsel was not restricted "in any way in inspecting the car." Put another way, the State responds that it is not required "to do the [D]efendant's job for him and ensure the most thorough, comprehensive, helpful inspection." The State also responds that the placement of the "trajectory" rod into the interior of the car was not newly discovered evidence. Finally, the State responds that the trial court fulfilled its duty as the thirteenth juror and approved the jury's verdict.

## A. Factual Background

As discussed earlier in this opinion, several pictures were introduced at trial of the victim's car with rods the investigators had "bought from Home Depot" inserted into exterior bullet holes in an attempt "to show a trajectory . . . of the projectiles." Pictures of the interior of the driver's side door were also introduced. Those pictures showed a bullet hole at the bottom of the door, a second bullet hole above the interior door handle, and what appeared to be a tear in the upholstery just underneath the interior door handle. Investigator Willis testified that he did not remember if he and the other investigator attempted to run a rod "from the inside" of the car. If they had, Investigator Willis admitted that he "didn't take a picture of it." Investigator Willis also testified that he could not remember if the bullet hole near the driver's side mirror on the exterior of the door "was possibly a pass through or not."

In addition to this evidence, the jury was allowed to view the victim's car in a parking lot behind the courthouse with the rods "inserted . . . into the car . . . as they appeared in [the] photograph[s]" that had been admitted into evidence. On the second day of the trial, the trial court addressed the procedure for allowing the jury to view the car. The trial court explained that the prosecutors, the Defendant, defense counsel, the trial court, and the court officers would go to a fenced-in area of the parking lot where they could observe the jury. The jury would then be brought out to view the car. The trial court stated that the car would remain "right out in the middle of the parking lot" for members of the media to take pictures of it during any of the breaks in the proceedings.

-13-

Investigator Willis briefly testified about the car and the pictures of the car with the "trajectory" rods inserted into the bullet holes. The trial court then instructed the jury about viewing the car. The trial court instructed the jury not to open the driver's side door because it would "change [the] direction of the rods," but informed them that they could look into the car from the passenger's side door or window. The jury viewed the car and then the trial court recessed for lunch. The State concluded its case late in the afternoon, and the court adjourned for the day.

The trial concluded the next day. Before the trial court began its instructions to the jury, a juror asked if the car had been entered into evidence. The trial court responded that it was not but that it was still in the parking lot, and they could view it during their deliberations if they wanted to. The trial court instructed the parties that it would treat the car as if it were a piece of evidence taken back with the jury to the jury room and that none of the parties would be present when the jury viewed the car during their deliberations. Defense counsel responded that he was "a-okay with not going out with the car."

The jury began its deliberations at 1:51 p.m. Around 6:00 p.m., the trial court asked the jury if they wanted to view the car again. They responded that they did not, and it was towed back to the JCPD impound lot. The jury returned their verdict at 8:30 p.m. The trial court approved the jury's verdict as the thirteenth juror. The trial court also entered a written order that night stating that it approved and accepted the jury's verdict "as thirteenth juror."

Investigator Willis testified at the motion for new trial hearing that the prosecutor instructed him to make the victim's car available to defense counsel prior to trial. Investigator Willis recalled that defense counsel inspected the car for thirty to forty-five minutes and looked at the interior of the car. Investigator Willis testified that he did not "place any restrictions" on defense counsel's inspection of the car. Investigator Willis admitted that the rods were not inserted into the bullet holes when defense counsel viewed the car, but he would have inserted the rods if defense counsel had asked. Investigator Willis believed that another investigator, Thomas Dillard, inserted the rods at the courthouse.

The trial court stated that the first thing the jury did when they started their deliberations was to view the car and that they did so for approximately thirty minutes. The trial court also stated that because of where they were located, the parties and the trial court could not see into the interior of the car while they observed the jury's viewing the car during trial. However, the trial court denied the motion for new trial, concluding that there was no discovery violation because the State made the car available for defense counsel's inspection and "what was there was always there." The trial court also concluded that the placement of the "trajectory" rod during trial was not newly

-14-

discovered evidence and that its failure to see the rod inserted into the interior of the car did not hamper its review as the thirteenth juror.

### B. Discovery Violation

Tennessee Rule of Criminal Procedure 16(a)(1)(F) provides that "[u]pon a defendant's request, the state shall permit the defendant <u>to inspect</u> and copy or photograph . . . tangible objects . . . if the item is within the state's possession, custody, or control." (Emphasis added). This also includes allowing for independent analysis and testing of the object by the defendant's expert. <u>State v. House</u>, 743 S.W.2d 141, 146 (Tenn. 1987). However, it is incumbent upon the defendant "to make a timely request" if he seeks to have such independent testing and analysis performed. <u>Smith v. State</u>, 566 S.W.2d 553, 559 (Tenn. Crim. App. 1978).

We agree with the trial court's conclusion that there was no discovery violation in this case. The State made the victim's car available for inspection prior to trial. Defense counsel inspected the car for thirty to forty-five minutes, and Investigator Willis testified that he did not place any restrictions on defense counsel's inspection of the car. While the "trajectory" rods were not inserted into the bullet holes when defense counsel inspected the car, Investigator Willis testified that he would have inserted the rods if defense counsel had asked. The tear in the upholstery was present in photographs the State provided to the Defendant during discovery. There is nothing in the appellate record to suggest that the hole in the interior of the car was created by the insertion of the rod prior to the jury's viewing the car. We agree with the trial court's conclusion that "what was there was always there." As such, we conclude that this issue is without merit.

### C. Newly Discovered Evidence

A new trial will be granted on the basis of newly discovered evidence only when a defendant has established the following: "(1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial." <u>State v. Caldwell</u>, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) (citing <u>State v. Goswick</u>, 656 S.W.2d 355, 358-60 (Tenn. 1983)). The decision to grant or deny a new trial on the basis of newly discovered evidence "rests within the sound discretion" of the trial court. <u>Id.</u> at 117.

Here, there was no newly discovered evidence as the tear in the upholstery evidencing the bullet hole "was always there." Even if the placement of the "trajectory" rod during the trial was viewed as newly discovered evidence, we could not conclude that the Defendant exercised reasonable diligence in attempting to discover the evidence. The trial court stated that the parties could not see the "trajectory" rod penetrating into the interior of the car from their vantage point where they observed the jury's viewing of the

car. However, the car was "right out in the middle of the parking lot" for two days of the trial. Still, defense counsel was unaware of how the "trajectory" rod had been positioned until the day after trial when he saw a picture of the car in the local newspaper. As such, we conclude that this issue is also without merit.

### D. Thirteenth Juror

Tennessee Rule of Criminal Procedure 33(d) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This is the modern equivalent of the thirteenth juror rule and "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Biggs, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (quoting State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995)) (internal quotation marks omitted).

It is only when "the record contains statements by the trial judge expressing dissatisfaction with the weight of the evidence of the jury's verdict, or [evidence] indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, [that] an appellate court may reverse the trial court's judgment" on the basis that the trial court failed to carry out its duty as the thirteenth juror. Carter, 896 S.W.2d at 122. "[T]he accuracy of a trial court's thirteenth juror determination is not a subject of appellate review." State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).

Here, the record is clear that the trial court fulfilled its duty as the thirteenth juror. The trial court approved the jury's verdict shortly after it was announced and also entered a written order that night stating that it approved and accepted the jury's verdict "as thirteenth juror." The Defendant's argument goes to the accuracy of the trial court's thirteenth juror determination, which cannot be challenged on appeal. Furthermore, the trial court stated in denying the Defendant's motion for new trial that its failure to see the rod inserted into the interior of the car did not hamper its review as the thirteenth juror. Accordingly, we conclude that this issue is without merit.

### CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-16-